IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NOEL KEITH WATKINS,

    Petitioner,                    No. CIV S-06-0685 MCE DAD P

    vs.

CAROL DALY, et al.,

    Respondents.                FINDINGS & RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner alleges that the decision of the California Board of Parole Hearings (hereinafter "Board") to deny him parole for four years at his second parole consideration hearing held on March 18, 2002, violated his federal constitutional right to due process. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

## PROCEDURAL BACKGROUND

        Petitioner is confined pursuant to a judgment of conviction entered in the Contra Costa County Superior Court in 1985 on a charge of second degree murder. (Pet. at consecutive p. 1.) Pursuant to that conviction petitioner was sentenced to twenty years-to-life in state prison. (Id.)

Petitioner's second parole consideration hearing, which is placed at issue in the instant petition, was held on March 18, 2002. (Answer, Ex. 2.) On that date, a panel of the Board, then the Board of Prison Terms, found petitioner not suitable for parole and denied parole for four years. (Id.)

Petitioner challenged the Board's decision in a petition for a writ of habeas corpus filed in the Solano County Superior Court. (Answer, Ex. 4.) That petition was denied by order dated January 7, 2004, with the following reasoning:

> Upon reading the application filed herein, the Court applies the "some evidence" standard when reviewing decisions of the California Board of Prison Terms. (In re Powell (1988) 45 Cal.3d 894, 904.) The Board of Prison Terms' decision will be upheld so long as there is some basis in fact to support the decision. Additionally, "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (In re Rosenkrantz (2002) 29 Cal.4th 616, 682.)
>
> The Board of Prison Terms found that petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board of Prison Terms based the finding on the facts of the commitment offense in which petitioner shot and killed a man. The board (sic) of Prison Terms considered all relevant factors and found that petitioner was unsuitable for parole. (See Cal. Code Regs., Tit. 15, Section 2402; In re Ramirez (App. 1 Dist. 2001) 94 Cal.App.4th 549, 569).
>
> IT IS THEREFORE ORDERED that the Petition for Writ of Habeas Corpus is denied.

(Id.)

On May 6, 2004, petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal for the First Appellate District, which was denied by order dated June 28, 2004. (Answer, Ex. 5.) Petitioner subsequently filed a petition for a writ of habeas corpus in the California Supreme Court. (Id.) That petition was denied, with citations to In re Dannenberg, 34 Cal. 4th 1061 (2005) and In re Rosenkrantz, 29 Cal. 4th 616 (2002), by order dated January 4, 2006. (Id.)

/////

FACTUAL BACKGROUND

The Board described the facts of petitioner's offenses, which have not changed over the years, at the March 18, 2002 parole suitability hearing, as follows:

> You know since I don't have your transcripts, your prior transcripts, I am going to read the Statement of Facts into the record again. And I'm going to take them from the Board report. It says on July 31st, 1983, Bob Altes, A-L-T-E-S, and Dana Bennett, B-E-N-N-E-T-T, and Greg Garcia went to Noel Watkins house in Oakley at 800 hours to pick up some marijuana. Watkins apparently was a minor drug dealer, was able to readily acquire drugs. When Garcia driving before [sic] made another drug stop where they acquired Valium, they took several Valiums, smoked some weed, and drank a half a pint of Seagram Canadian Whiskey and 7-Up and drove back to Watkins' house to get more weed. Along the way, Garcia was stopped by the Brentwood police for weaving along Highway 4. They later arrived at Watkins' home. Watkins returned to the car with a 25-caliber handgun. Exiting along a dirt road in front of his house, they came upon a pick up truck that flashed his lights for right of way on the road. Garcia's car became stuck in sand at the side of the road. Watkins exited the vehicle, ran towards the vehicle and shot the passenger, David Mosby, M-O-S-B-Y, in the face, the bullet driving towards his upper sinus passages into his neck and lodged next to his spinal chord. Mosby's right shoulder suffered nerve damage. He became unconscious and fell out of the truck. Upon seeing Watkins shoot Mosby, Steve Pasley, P-A-S-L-E-Y, exited the truck and took off running. He was shot in the chin at close range. A second bullet caught him in the right shoulder and a third bullet through the lower back penetrating his lung and exiting through his chest. Pasley collapsed and died over a row fence of a neighbor's yard. Watkins then ran home. Altes stated he was unaware that anyone had actually been shot, followed Watkins to his home and found him in the process of re-loading the handgun and his two 22-caliber rifles. Altes tried to convince Watkins not to hurt anyone. Watkins' father took the handgun from him and his mother asked Altes to leave. Police arrived and arrested Watkins without incident. A search of the home revealed a 25-caliber pistol and two loaded rifles, a loaded 10-shot clip, a loaded Winchester 30/30, a photograph album including several photographs of Watkins sporting firearms, including the murder weapon, and a manual entitled the Anarchist's Cookbook.

(Answer, Ex. 2 at 7-9.)

Petitioner admitted at the March 18, 2002 parole suitability hearing that he committed these crimes. (Id. at 9.) He explained that he had been drinking at the time of the

3

crimes, that he had "enemy situations in the area," and that he had had an unpleasant conversation with the occupants of the victims' car immediately prior to the shootings. (Id. at 9-10.) Petitioner acknowledged that Mr. Pasley was an "innocent victim." (Id. at 10.) When pressed about why he committed the crimes, petitioner explained that he was provoked and "taunted" and that "the fellows that dropped by the house I guess flipped [my] button." (Id. at 13.) Petitioner explained that he had fought with "one of the local guys at a local bar" several weeks prior to the shooting, but that victim Pasley was not one of the persons he fought with. (Id. at 12.)

## ANALYSIS

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues <u>de</u> <u>novo</u>. <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003). Title 28 § 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

/////

4

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

II. Petitioner's Claims

Petitioner claims that the Board's decision finding him unsuitable for parole at the hearing on March 18, 2002 violated his right to due process. He argues that he has "met all the criteria necessary for parole." (Pet. at page 4 of 197.) He claims the Board members "had made a decision prior to petitioner's parole board hearing to deny him a parole date." (Id.) Petitioner also argues that the Board's decision was "biased and improper" because it was based mainly on the facts of his crime of conviction. (Id. at page 5 of 197.)

   A. Due Process in the California Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A litigant alleging a

5

due process violation must first demonstrate that he was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution "by reason of guarantees implicit in the word 'liberty,'" or from "an expectation or interest created by state laws or policies." Wilkinson v. Austin 545 U.S. 209, 221 (2005) (citations omitted). See also Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)). California's parole scheme gives rise to a cognizable liberty interest in release on parole, even for prisoners who have not already been granted a parole date. Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; see also In re Lawrence, 44 Cal. 4th 1181, 1204, 1210, 1221 (2008). Accordingly, this court must examine whether the state court's conclusion that California provided the constitutionally required procedural safeguards when it deprived petitioner of a protected liberty interest is contrary to or an unreasonable application of federal law.

Because "parole-related decisions are not part of the criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated." Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (internal quotations and citation omitted). Where, as here, parole statutes give rise to a protected liberty interest, due process is satisfied in the context of a hearing to set a parole date where a prisoner is afforded

6

notice of the hearing, an opportunity to be heard and, if parole is denied, a statement of the reasons for the denial. Id. at 1390 (quoting Greenholtz, 442 U.S. at 16). See also Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (describing the procedural process due in cases involving parole issues). Violation of state mandated procedures will constitute a due process violation only if the violation causes a fundamentally unfair result. Estelle, 502 U.S. at 65.

In California, the setting of a parole date for a state prisoner is conditioned on a finding of suitability. Cal. Penal Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402. The requirements of due process in the parole suitability setting are satisfied "if some evidence supports the decision." McQuillion, 306 F.3d at 904 (citing Superintendent v. Hill, 472 U.S. 445, 456 (1985)). See also Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992)). For purposes of AEDPA, Hill's "some evidence" standard is "clearly established" federal law. Sass, 461 F.3d at 1129 (citing Hill, 472 U.S. at 456). "The 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence in the record that could support the conclusion reached by the factfinder. Powell, 33 F.3d at 40 (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)); Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence underlying the board's decision must have some indicia of reliability." Jancsek, 833 F.2d at 1390. See also Perveler, 974 F.2d at 1134. Determining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The question is whether there is any reliable evidence in the record that could support the conclusion reached. Id.

When a federal court assesses whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) This court mus therefore:

/////

> look to California law to determine the findings that are necessary
> to deem a prisoner unsuitable for parole, and then must review the
> record in order to determine whether the state court decision
> holding that these findings were supported by "some evidence" in
> [petitioner's] case constituted an unreasonable application of the
> "some evidence" principle articulated in Hill.

Id.

The state regulation that governs parole suitability findings for life prisoners states as follows with regard to the statutory requirement of California Penal Code § 3041(b): "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2281(a). In California, the overriding concern in determining parole suitability is public safety. In re Dannenberg, 34 Cal. 4th at 1086. This "core determination of 'public safety' . . . involves an assessment of an inmates current dangerousness." In re Lawrence, 44 Cal. 4th at 1205 (emphasis in original). Accordingly,

> when a court reviews a decision of the Board or the Governor, the
> relevant inquiry is whether some evidence supports the decision of
> the Board or the Governor that the inmate constitutes a current
> threat to public safety, and not merely whether some evidence
> confirms the existence of certain factual findings.

In re Lawrence, 44 Cal. 4th at 1212 (citing In re Rosenkrantz, 29 Cal. 4th at 658; In re Dannenberg, 34 Cal. 4th at 1071; and In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but [] become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal. 4th at 1078. The Board normally sets a parole release date one year prior to the inmate's minimum eligible parole release date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal. 4th at 1202 (citing Cal. Penal Code § 3041(a)). A release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted

offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ." Cal. Penal Code § 3041(b). In determining whether an inmate is suitable for parole, the Board must consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs., tit. 15, § 2281(b).

The regulation identifies circumstances that tend to show suitability or unsuitability for release. Id., § 2281(c) & (d). The following circumstances have been identified as tending to show that a prisoner is suitable for release: the prisoner has no juvenile record of assaulting others or committing crimes with a potential of personal harm to victims; the prisoner has experienced reasonably stable relationships with others; the prisoner has performed acts that tend to indicate the presence of remorse or has given indications that he understands the nature and magnitude of his offense; the prisoner committed his crime as the result of significant stress in his life; the prisoner's criminal behavior resulted from having been victimized by battered women syndrome; the prisoner lacks a significant history of violent crime; the prisoner's present age reduces the probability of recidivism; the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; institutional activities indicate an enhanced ability to function within the law upon release. Id., § 2281(d).

The following circumstances have been identified as tending to indicate unsuitability for release: the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; the prisoner had a previous record of violence; the prisoner has an unstable social history; the prisoner's crime was a sadistic sexual offense; the prisoner had a lengthy

9

history of severe mental problems related to the offense; the prisoner has engaged in serious misconduct in prison. Id., § 2281(c). Factors to consider in deciding whether the prisoner's offense was committed in an especially heinous, atrocious, or cruel manner include: multiple victims were attacked, injured, or killed in the same or separate incidents; the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; the victim was abused, defiled or mutilated during or after the offense; the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable or very trivial in relation to the offense. Id., § 2281(c)(1)(A) - (E).

In the end, under current state law as recently clarified by the California Supreme Court,

> the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. (Dannenberg, supra, 34 Cal. 4th at pp 1083-84 [parallel citations omitted].) Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [citations omitted].

In re Lawrence, 44 Cal. 4th at 1221.

In addition, in recent years the Ninth Circuit Court of Appeals has concluded that, given the liberty interest that California prisoners have in release on parole, a continued reliance upon an unchanging factor to support a finding of unsuitability for parole over time may constitute a violation of due process. The court has addressed this issue in three significant cases, each of which will be discussed below.

First, in Biggs, the Ninth Circuit Court of Appeals recognized that a continued reliance on an unchanging factor such as the circumstances of the offense could at some point

10

result in a due process violation.[1]  While the court in Biggs rejected several of the reasons given by the Board for finding the petitioner in that case unsuitable for parole, it upheld three:  (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy.  Biggs, 334 F.3d at 913.  However, the court in Biggs cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to committing that offense in denying parole could, at some point, violate due process.  In this regard, the court observed:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

334 F.3d at 916.  The court in Biggs also stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Id. at 917.

In Sass, the Board found the petitioner unsuitable for parole at his third suitability hearing based on the gravity of his offenses of conviction in combination with his prior offenses.  461 F.3d at 1126.  Citing Biggs, the petitioner in Sass contended that reliance on these unchanging factors violated due process.  The court disagreed, concluding that these factors amounted to "some evidence" to support the Board's determination.  Id. at 1129.  The court provided the following explanation for its holding:

/////

---

[1] That holding has been acknowledged as representing the law of the circuit.  Irons, 505 F.3d at 853; Sass, 461 F.3d at 1129.

11

>While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation." Biggs, 334 F.3d at 917 (emphasis added). Under AEDPA it is not our function to speculate about how future parole hearings could proceed. Cf. id. The evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision. Consequently, the state court decisions upholding the denials were neither contrary to, nor did they involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

Id.

In Irons the Ninth Circuit sought to harmonize the holdings in Biggs and Sass, stating as follows:

>Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in Sass precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief.
>
>We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.
>
>Furthermore, we note that in Sass and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his

    rehabilitation, will at some point violate due process, given the
liberty interest in parole that flows from the relevant California
statutes. Biggs, 334 F.3d at 917.

Irons, 505 F.3d at 853-54.[2]

  B. Analysis

   In addressing the factors it considered in reaching its 2002 decision that petitioner was unsuitable for parole, the Board in this case stated as follows:

> PRESIDING COMMISSIONER WELCH: Okay. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The offense was carried out in an especially cruel and callous manner. Multiple victims were injured and one person was killed in the offense. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was inexplicable and very trivial in relationship to the offense. The prisoner was on probation at the time that he committed the instant offense. These conclusions were drawn from the Statement of Facts wherein on July 31st, 1983, the prisoner and his associates decided to, well his associates decided to go to the prisoner's house to purchase some marijuana from him. The bottom line is, there was a vehicle apparently the victims blinked their lights. The prisoner got out of his car and approached the car and he shot one victim and as the other victim attempted to run away, the prisoner shot him and that resulted in his death. And the victim, by the way, is Mosby, —O-S-B-Y. And the other victim that he actually killed is Pasley, P-A-S-L-E-Y. The prisoner had an escalating pattern of criminal conduct and violence. He had a history of unstable and tumultuous relationships with others. He failed previous grants of probation and cannot be counted upon to avoid criminality. He failed to profit from society's previous attempts to correct his criminality.

---

[2] The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide some evidence that the inmate remains a current threat to public safety. In re Lawrence, 44 Cal. 4th at 1218-20 & n. 20. Additionally, a recent panel of the Ninth Circuit in Hayward v. Marshall, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc. Hayward v. Marshall, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in Hayward is no longer citable precedent.

Such attempts included adult probation. The prisoner had an unstable social history. His unstable social history would have to be his involvement in different kinds of drugs and to the degree that he was actually selling drugs. Prior criminality includes at a very early age burglary, vandalism, arrest for attempting to commit rape, threatening with a weapon, disturbing the peace, attempted murder, driving under the influence, driving on a revoked license, carrying a concealed weapon in a vehicle, carrying a loaded weapon in a public place. And it should be noted that some of these offenses occurred while the prisoner was on probation. The prisoner has failed to upgrade vocationally as previously recommended by the Board. The prisoner has not significantly participated in self-help programs, it's been an off and on type of thing. The prisoner has failed to demonstrate evidence of positive change while incarcerated. On my count, the prisoner has a total of 17 disciplinaries with his most recent one being committed as recently as October 31st, 2000, and 10/8/99. The psychiatric report dated 10/29/01 by Dr. Gary Collins. After reviewing the report and even though the doctor does not under assessment of dangerousness give a definitive answer in terms of whether or not the prisoner would be a danger to society. But if you read the report under Assessment of Dangerousness, she (sic) gives some signs that, she (sic) gives some indicators that would indicate that the prisoner would be, or would not be, would or would not be a danger to society. She (sic) writes threats of and actual violence before prison, an interest in weapons, drug abuse, and poor adjustment. Under indicators that he probably would not be violent is that he was raised in an intact family, he has no history of major mental disorder, and he has a history of employment before prison, and no known record of violence as a young age, or as a juvenile. I'm assuming is what she (sic) means. But then she (sic) goes on to write, this man means no harm, but shows poor judgment about his future plans. So based on that, I would conclude that the psychiatric report is not a supportive report in terms of release. That the prisoner would probably pose an unacceptable risk of dangerousness if released, based on the psychiatric report. The prisoner lacks realistic parole plans. He does have residential plans; however, he does not have acceptable employment plans –

INMATE WATKINS: May Trucking said they would give me a chance.

PRESIDING COMMISSIONER WELCH: And I will give you an opportunity to address that at the end. The hearing panel notes that in response to Penal Code 3042 notices indicating an opposition to a finding of parole suitability, that specifically the Deputy District Attorney from Contra Costa County spoke in opposition of a finding of suitability at this time. The prisoner, the Panel makes the following findings: the prisoner needs therapy in order to face, discuss, understand, and cope with stress in a non-destructive

manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others and I think that's pretty much beared out both in the counselor's report and in the psychological report, would tend to support that. The prisoner's gains are recent and he must demonstrate an ability to maintain gains over an extended period of time. Nevertheless, there are things that the prisoner should be commended for. You know about the only thing I can, you know, on second thought, it's really difficult to find something to really commend you for. You did off and on, you have participated in AA, but that hasn't been on an ongoing basis. You know, I was struggling to find something that you have really done that the Board could really compliment you on. But you haven't really programmed in a very good manner. Therefore, we're going to give you another four-year, well you earned another four-year denial based on your programming. So you're going to receive another four-year denial. In a separate decision, the hearing Panel finds that the prisoner has been convicted of murder and it's not reasonable to expect that parole would be granted at a hearing during the following four years. The specific reasons is one the crime. You was [sic] drinking and apparently used some drugs and you approached two individuals in a car. And based on what I could read from the reports is without provocation two individuals was [sic] shot and you definitely shot and killed the last person as he was attempting to flee for his life you shot him in the back. So, multiple victims was [sic] injured, I mean multiple victims was [sic] involved in the incident. One was injured, another one was killed. The offense was carried out in a dispassionate manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was inexplicable or at the least very trivial and even today during the conversation with you when you were afforded the opportunity to discuss the crime or come up with a motive, it didn't make sense. And the crime didn't make sense then and it doesn't make sense now. And the reasoning behind, that you gave behind the crime didn't make sense. You were recently involved in serious disciplinaries, three serious, well you were recently involved in disciplinaries. You received three disciplinaries since your last hearing. The last one was administrative report on 10/31/2000, for the grooming standards. You received another one on 10/8/99, for rule violation or refusing to work and another one on 4/24/99, for refusing to work. And you also received 128's. One for refusing to work, another one for reporting to work late, failure to respond to a cell pass, and one for grooming and one for refusing to return to your cell. One for unkempt quarters and one for out of bounds. So you haven't really programmed in a very good manner since you were here last.

INMATE WATKINS: Yeah, I think I've only had three jobs. I worked three jobs –

/////

| | |
|---|---|
| 1 | PRESIDING COMMISSIONER WELCH:  Hold on just a second, sir.  I'll give you a chance.  Recent psychiatric report dated 10/29 by Dr. Collins, C-O-L-L-I-N-S, indicates a need for a longer period of observation and evaluation.  The prisoner has not completed necessary programming which is essential to his adjustment so needs additional time to gain such programming.  You've failed to upgrade vocationally and you've failed to participate in substance abuse on an ongoing manner, in an ongoing situation, in an ongoing manner, not in a consistent manner I guess I should say.  And it's also noted that the correctional counselor's report, which was a very detailed report, and it appears to be a fair report.  And he writes in here, he describes you as a slacker.  The prisoner is a slacker who after almost 17 years of being incarcerated have [sic] only worked a little over 300 days.  He describes you as a person who continually avoids programming, continually avoids working.  And we do realize that you have medical problems, but over a period of 17 years, one would tend to agree with the counselor that you could possibly be classified as a person that's trying to avoid work or trying to participate at the very least.  The Panel recommends one, that you become and that you remain disciplinary-free.  Two that you reduce your custody level.  You have 121 points and that means you're a Level IV.  We recommend that you continue to upgrade vocationally and that you participate in self-held programming.  And that concludes this decision at approximately 11:45. |

14  (Answer, Ex. 2 at 62-69.)  After taking into consideration the Ninth Circuit decisions in <u>Biggs</u>,

15  <u>Sass</u>, and <u>Irons</u>, and for the reasons set forth below, this court concludes that petitioner is not

16  entitled to federal habeas relief with respect to his due process challenge to the Board's March

17  18, 2002, decision denying him parole.

18      First, and perhaps most importantly, at the time of the challenged parole

19  suitability hearing, petitioner had not yet served the minimum number of years required by his

20  sentence.  Petitioner was sentenced to 20 years-to-life in 1985 and the parole hearing at issue was

21  held 17 years later, in 2002.  Pursuant to the holding in <u>Irons</u>, petitioner's right to due process

22  was not violated when he was deemed unsuitable for parole prior to the expiration of his

23  minimum term.  <u>Irons</u>, 505 F.3d at 665.  Further, the Board's decision that petitioner was

24  unsuitable for parole and that his release would unreasonably endanger public safety was

25  supported by "some evidence" that bore "indicia of reliability."  <u>Jancsek</u>, 833 F.2d at 1390.  The

26  Board relied on the circumstances of petitioner's offense of conviction, his prior criminal history,

16

the need for him to come to terms with the motivation for his crime, his disciplinary convictions in prison, his overall performance in prison, and his most recent psychiatric report, in denying him a parole date. The Board also relied on petitioner's unstable social history, defined as petitioner's use and sale of illegal drugs. According to the cases cited above, these factors constitute "some evidence" supporting the Board's decision that petitioner was not yet suitable for release on parole, especially where he had not served the minimum term required by his sentence. Sass, 469 F.3d at 1129; Irons, 505 F.3d at 665. This is true even though petitioner may have a place to live and job prospects upon release from prison.

Petitioner's claim that the Board had already decided he was unsuitable for parole before the suitability hearing began is based on Commissioner Welch's statement that "in a separate decision, the hearing Panel finds that the prisoner has been convicted of murder and it's not reasonable to expect that parole would be granted at a hearing during the following four years." (Answer, Ex. 2 at 66-67.) Petitioner is mistaken as to the import of this statement. It is clear that Commissioner Welch did not mean that the Panel had separately, or previously, decided that petitioner was not suitable for parole. Rather, the Commissioner was explaining that the Panel's decision that petitioner's next parole suitability hearing would not be held for another four years was a "separate decision" from the Board's decision that petitioner was unsuitable for parole.

The Board's 2004 decision that petitioner was unsuitable for parole and would pose a danger to society if released meets the minimally stringent test set forth in Biggs, Sass, and Irons. Accordingly, petitioner is not entitled to relief on his claim that the Board's failure to find him suitable for parole at the March 18, 2002 parole suitability hearing violated his right to due process. Sass, 461 F.3d at 1129; Irons, 505 F.3d at 664-65.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

17

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 30, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
watkins685.hc